AUTOVENT FAN & BLOWER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 240. Decided October 30, 1926.

1. VALUATION OF PATENT.—In 1918 the petitioner acquired a certain patent for which it issued shares of its capital stock. Upon the evidence, *held*, that at the time acquired this patent had a cash value of $12,500.

2. DEDUCTION FOR EXHAUSTION.—During the taxable years petitioner is entitled to deduction for this patent on the basis of $12,500 prorated over the life of the patent.

*F. E. Seidman, C. P. A.,* and *M. Wexler, C. P. A.,* for the petitioner.

*John W. Fisher, Esq.,* for the respondent.

This is a proceeding for the redetermination of a deficiency in income and profits taxes for the calendar years 1918, 1919, and 1920.

The petitioner alleges that the Commissioner erred in disallowing, in each of the years involved, a deduction for depreciation on a patent acquired by the petitioner in 1918 at an alleged cost of $12,500.

### FINDINGS OF FACT.

The Autovent Fan & Blower Co. is an Illinois corporation, with its principal office at Chicago, and is the successor to the Batterman-Truitt Co.

The Batterman-Truitt Co. was incorporated in January, 1916, by H. E. Batterman, Emil Ackerman, and Joseph E. Truitt, with an authorized capital stock of $5,000. Each of the three named incorporators held 166⅔ shares of $10 par value. The corporation engaged in the business of selling fans and ventilating equipment. In 1918, Ackerman and Truitt purchased Batterman's 166⅔ shares of stock for $4,000.

In 1909, Truitt started working on the development of an automatic shutter, or damper, to be used as an attachment to fans and blowers to prevent a back-draft after turning off the fan or blower. This apparatus was known as a louvre. Truitt and Ackerman experimented together on this apparatus until about 1915. On January 1, 1918, patent No. 1,251,593 was issued to Truitt and Ackerman for this shutter apparatus or louvre. All expenses incurred in experimenting and in obtaining the patent were paid by Truitt and Ackerman. During the year 1917 and during a part of the year 1918 a few louvres were manufactured by the corporation and sold, with fans or separately, and the profits were included in the profits of the corporation, but the patent remained the property of Truitt and Ackerman. They received no royalties on the sale

of this attachment by the corporation. At the time this louvre was invented there was one of a similar nature on the market, but it was rectangular in shape and operated by gravity, while the louvre patented by Truitt and Ackerman was circular in shape so as to fit the fan and was operated automatically, opening when the fan was turned on and closing when the fan was turned off.

Truitt and Ackerman decided to have a third partner in the business and to sell their patent to the corporation. The following agreement was entered into:

THIS AGREEMENT made and entered into this 10th day of April, A. D. 1918, by and between Joseph E. Truitt and Emil Ackerman, parties of the first part, and Theodore F. LeJeune, party of the second part WITNESSETH:

That in consideration of the purchase by the second party from the first parties of one hundred and sixty-six and two-thirds (166⅔rds) shares of the capital stock of Batterman Truitt Company, an Illinois corporation, for the sum of Four thousand dollars ($4,000) it is understood and agreed by and between the parties hereto, being the owners of all of the capital stock of said corporation, that said second party thereby acquires an equal one-third interest in said corporation, and in all of its business, assets and surplus of every kind and nature as the same stands of this date subject to the payment of all existing debts and obligations, it being a part of the inducement moving said second party to purchase said stock that he be permitted to enter said corporation on an equal basis with each of the parties of the first part.

In further consideration of the premises and of the payment by the party of the second part to the parties of the first part of one-third of the cost and expense incurred by them in procuring a certain patent known as "Louvre" patent issued January 1, 1918, bearing patent number 1251593 and serial number 178094, said party of the second part shall be beneficially and equitably entitled to a one-third interest in said patent on an equal basis with each of said first parties. For convenience the legal title to said patent shall for the present remain in said first parties and no formal assignment thereof shall be made of said one-third interest to said second party, but said legal title is hereby understood to be held for the equal use and benefit of each of the three signers of this agreement and the proceeds of any disposition or use of said patent shall be equally divided among said Joseph E. Truitt, Emil Ackerman and Theodore F. LeJeune.

In pursuance to above-quoted agreement, LeJeune acquired the 166⅔ shares of stock which Truitt and Ackerman had acquired from Batterman, and the $4,000 represented the book value of the stock. At the time the taxpayer corporation made its offer to LeJeune he was earning from $6,000 to $8,000 a year. The corporation could not afford to pay him that amount for his services so, to offset the difference in salary, LeJeune acquired a one-third interest in the patent as well as a one-third interest in the corporation.

During 1918, Arthur Donovan, attorney for the petitioner, and Benjamin M. Anderson, head of his own insurance business, offered in writing to purchase as much stock as the corporation would sell

at the book value. Both of these men were ready, willing, and able to buy.

In August, 1918, the capital stock of the Batterman-Truitt Co. was increased to $12,500 through the issue of a stock dividend of 750 shares of the total par value of $7,500. The stock was issued to Joseph E. Truitt, 250 shares; to M. O. Ackerman, 250 shares; and to Theodore E. LeJeune, 250 shares.

September 19, 1918, the patent for the louvre was assigned to the Batterman-Truitt Co. The capital stock of the corporation was increased to $25,000, and the 1,250 shares of new stock, at a par value of $10 per share, were issued in payment for the patent. This new stock was issued to Truitt, 416⅔ shares; to Ackerman, 416⅔; and to LeJeune, 416⅔ shares. In 1919 the capital stock was increased to $30,000 by a stock dividend.

The petitioner's books show the following in reference to sales:

|  | Louvre. | Fans. | Motor-driven blowers. | Pulley-driven blowers. |
|---|---|---|---|---|
| 1917 | $282.21 |  |  |  |
| 1918 | 1,668.30 | $59,860.87 | $14,593.16 | $8,847.70 |
| 1919 | 2,844.22 | 89,451.13 | 15,459.10 | 9,746.35 |
| 1920 | 6,602.90 | 146,842 14 | 25,140.99 | 8,642.11 |
| 1921 | 5,493.14 | 124,334.58 | 17,071.50 | 15,468.00 |
| 1922 | 5,799.81 | 119,322.55 | 30,400.83 | 14,088.95 |
| 1923 | 8,287.63 | 164,588.99 | 24,938.38 | 18,771.46 |

|  | Total sales (including miscellaneous). | Net profits (after all deductions, including income taxes, and depreciation). | Net worth of company (including capital stock, surplus, and surplus reserve as at Jan. 1 of each year). |
|---|---|---|---|
| 1916 | $31,239.74 | $4,877.23 | Not given. |
| 1917 | 67,949.90 | 4,177.56 | Not given. |
| 1918 | 95,060.88 | 3,506.31 | Not given. |
| 1919 | 130,885.72 | 6,647.67 | $26,990.87 |
| 1920 | 222,024.69 | 9,372.09 | 35,188.70 |
| 1921 | 201,370.63 | 3,981.26 | 45,630.20 |
| 1922 | 224,996.10 | 6,862.13 | 55,950.03 |
| 1923 | 296,907.34 | 21,404.03 | 52,624.26 |

The books do not show a separate record of the sales of louvres attached to fans or blowers, for they were sold as a unit. The greater percentage of fans sold had the louvre attachment, for the sale of the fan and louvre as a unit greatly increased the petitioner's sales of fans.

The petitioner in its original returns for the years 1919 and 1920 claimed a deduction for depreciation of the louvre patent, which the Commissioner disallowed.

OPINION.

TRUSSELL: Prior to the assignment of the patent to the petitioner, Truitt secured three appraisals of the value thereof. In August, 1918, John Johnson Haines valued the patent at $25,000. Haines is vice president and secretary of the Haines Company, which has been engaged in the business of ventilating contractor for twenty years. Haines has been connected with the company for twenty years, and in his business as a contractor he has come in contact with various patented articles used in ventilating. While he has never appraised patented articles, his experience in buying and selling such articles as are used in his business has familiarized him with the values of such patents. In placing the value of $25,000 on the patent in question, he took into consideration the business which the petitioner was doing; the demand and cost of the one other gravity-operated louvre which had been on the market for several years, and the demand which would be made for the petitioner's automatic louvre; the fact that this attachment would materially increase the sales in fans, for he knew through experience that purchasers would rather buy the fan and attachment as a unit from one concern; and also the economic life of the patent, that is, about how long a time would elapse before a new and better shutter device would supersede it. After the petitioner began producing the louvre the Haines Company purchased articles from it for use in contracting work, and 90 per cent of the fans purchased were equipped with the patented louvre.

In August, 1918, Charles Edward Murray valued the patent at $15,000. Murray has been connected with the Mellish-Hayward Co. for thirty years, and is engaged in closing contracts, estimating, superintending and looking after finances for the company, which is a contractor for heating and ventilating. Murray is experienced in the matter of patented articles used in connection with ventilating and has assisted in valuing such articles as they effected increases in sales and profits. Murray was familiar with the gravity-operated louvre and the louvre covered by the patent here in question, and the value which he placed upon the latter was the amount his company would have paid for the patent had the company had the opportunity to purchase it. Murray estimated that the profits on the patented louvre would amount to $2,500 or $3,000 a year, and this was based on the fact that the article was satisfactory mechanically, that it was not a new proposition which would have to be introduced because there had been a similar article on the market for several years which was quite successful, that a louvre was necessary in proper ventilating, and, also, he foresaw a great demand for this patented louvre. Murray valued the patent at $15,000, independent and irrespective of the petitioner and its business.

In August, 1918, Fred B. Gillespie valued the louvre patent at $20,000. Gillespie is president of the Gillespie-Dwyer Co., contractor for heating and ventilating systems. Gillespie has been engaged in this line of business since 1914 and has been in constant contact with the various devices and equipment used in the business of ventilating and heating and also with improvements on such devices. He was familiar with the patented louvre and knew that it was mechanically superior to any louvre or shutter already on the market, being more substantially constructed and requiring less power to operate it. The valuation of $20,000 was based on Gillespie's experience with ventilating devices and the values of the same; the fact that his concern had experienced difficulty in selling fans without shutters or louvres; that it had been at times embarrassing to purchase fans from one concern and louvres from another; that there was a great demand for shutters or louvres; that in 1918 his concern was interested in trying to produce a shutter or louvre of its own, and, further, that the sale of the fan and louvre as a unit by one concern would greatly increase sales. Gillespie had never valued patents before but based his appraisal on his own knowledge of the ventilating and heating business and the values of the various devices used.

Edward T. Blaker, sales engineer for the Bishop & Babcock Sales Co., is a bachelor of mechanical engineering and for seven years has been engaged as sales engineer, his duties being to investigate new devices and patented articles to determine their mechanical utility and sales value. Blaker first became acquainted with the louvre covered by the patent here in question in the latter part of 1918 in a competitive manner. He was selling a louvre manufactured by another concern. It was a part of Blaker's duties to make a special examination for his company of the mechanical and sales features of this patented louvre. This patented louvre is the same article today as it was in 1918, when it was first put on the market. In the latter part of 1925, or early in 1926, Blaker suggested to his company that they negotiate with the petitioner corporation in regard to their handling the fan and louvre because of its mechanical differences and advantages over the type they used and its benefit to the sales organization. This suggestion was based upon Blaker's investigation of the patented louvre's mechanical operations and without reference to sales made by the petitioner corporation. Blaker's appraisal of the patent here in question was $20,000, which amount he would have paid for the patent in 1918 as well as in 1925.

At the time the louvre patent was assigned to the petitioner, its owners and the petitioner placed a value upon it in the amount of

$12,500. Four competent witnesses have testified that in their opinion this patent, at the time acquired by the petitioner, had a value ranging from $15,000 to $25,000.

It may also be observed from the figures of annual sales made by the petitioner that the sales of fans increased from an average of $75,655 for the two years 1918 and 1919 to an average of $138,000 per year for the four years 1920 to 1923, inclusive; and that the total sales made by the petitioner increased from an average of $64,747 for the three years 1916 to 1918, inclusive, to an average of $189,059 for the five years 1919 to 1923, inclusive. It thus seems that there can be no doubt that when the petitioner acquired this patent it acquired a valuable asset which contributed in a considerable degree to the volume of the petitioner's business, and we are therefore of the opinion, and find, that at the time acquired this patent had a cash value of $12,500, and that for the years here in question the petitioner is entitled to a deduction based upon the pro rata exhaustion of $12,500 over the period of the life of the patent.

*Judgment will be entered on 15 days' notice, under Rule 50.*